Slip Op. 18 - 56

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
———————————————————————  :
MID CONTINENT STEEL & WIRE, INC.,  :
                                   :
                  Plaintiff,       :
                                   :
          v.                       :     Before: R. Kenton Musgrave, Senior Judge
                                   :     Court No. 16-00244
UNITED STATES,                     :
                                   :
                  Defendant.       :
———————————————————————  :
```

## OPINION AND ORDER

[Denying motion for judgment on 2014-2015 administrative review of antidumping duty order on certain steel nails from the United Arab Emirates.]

Dated:  May 22, 2018

*Adam H. Gordon* and *Ping Gong*, The Bristol Group PLLC, of Washington, DC, for the plaintiff.

*Eric J. Singley*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of Counsel on the brief was *Mercedes C. Morno*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Musgrave, Senior Judge: The plaintiff Mid Continent Steel & Wire, Inc. ("Mid

Continent") invokes jurisdiction under 28 U.S.C. §1581(c) to challenge *Certain Steel Nails From*

*the United Arab Emirates* ("UAE"), 81 Fed. Reg. 71482 (Oct. 17, 2016), Public Record ("PDoc" [1])

---

[1]  The parties have not provided any confidential record documents for examination; parallel citation to the confidential record ("CDocs") is therefore omitted herein.

132.   The publication covers the final results of the 2014-2015 administrative review of the

antidumping duty ("AD") order on that subject merchandise, as further elucidated by the U.S.

Department of Commerce, International Trade Administration ("Commerce:), in its accompanying

issues and decision memorandum dated October 11, 2016 ("*IDM*"), PDoc 126.  The period of review

("POR") is May 1, 2014, through April 30, 2015.

        During the review, Commerce found that the sole mandatory respondent Overseas

Distribution Services, Inc. ("ODS") lacked a viable home or third-country market during the POR.

In order to calculate constructed value ("CV") profit and selling expenses, Commerce therefore

resorted to the "any other reasonable method" option of 19 U.S.C. §1677b(e)(2)(B)(iii) to find a

surrogate for the profit and selling expenses for ODS. Prelim. Dec. Mem. at 11, PDoc 107.

        Mid Continent agrees such resort was proper in theory.  Pl's 56.2 Br. at 9.  To

Commerce, it thus argued in favor of using the financial statements of Overseas International Steel

Industry LLC ("OISI"), an affiliate of ODS located in Oman. Commerce, however, concluded that

OISI's financial statements' lack of information on inventory accounts and raw material costs were

more indicative of a company providing a "service," not a "good," and therefore it concluded OISI's

financials did not provide a reasonable surrogate for CV profit and selling expenses.  From among

the remaining seven alternative sources for CV profit and selling expenses, for the final results

Commerce favored using the profit and expense data from the financial statements of L.S. Industry

("LSI"), a producer of steel nails in Thailand, after finding LSI "the only company we can conclude,

based on record evidence, is a producer of nails during the POR."  *IDM* at 9.

Mid Continent challenges that decision.  The overall question here is whether Commerce's determination is supported by substantial evidence and otherwise in accordance with law.  *See* 19 U.S.C. §1516a(b)(1)(B)(i).  The court concludes that it is.

I

Based on Commerce's statements in the *IDM*, the defendant argues "the record showed that OISI did not actually produce steel nails during the period of review".  Def. Br. at 5. Mid Continent correctly points out, however, that the record is in contrast to that position in the form of ODS's certified questionnaire responses:

> Please note that although [OISI] . . . (an affiliate listed in Exhibit A-3) produces nails on a job-work basis for ODS (and whose sales are accounted for by ODS, based on invoicing done by OISI), it is a separate and distinct company that operates in Oman - and their nails, whose production process is entirely conducted in Oman, would be considered of Omani origin, and hence (1) not subject merchandise for this review, and (2) not reported in Exhibit A-I. OISI serves as importer of record for imports manufactured in and exported from Oman. At the time of import, OISI posts cash deposits for antidumping duties relating to the antidumping duty order on nails from Oman.

PDoc 25 at A-4 n.3.

> ODS and OISI both produce wire nails, as well as, other non-subject merchandise using wire rods and other raw materials.

PDoc 49 at 5.

> Similarly, the production process for nails exported from OISI (using the balance wire rods after transfer of ODS) is entirely carried out at their facility in Al Buraimi, making those nails Omani origin.

*Id.*

> Please note that all nails produced by OISI in Oman are completely produced in, packed at, and shipped from Oman itself. They are never physically transferred to ODS in Dubai before shipment. Since the entire manufacturing process took place

in Oman, they are of Omani origin and hence considered non-subject merchandise in this administrative review of UAE nails.

*Id*. at 7.

Since the goods physically produced by OISI in Oman are OISI sales and are of Omani origin, the commercial invoice issued to the customer is also issued by OISI.

*Id*. at 13.

But, for the final results Commerce also acknowledged ODS's argument that "OISI operates as a 'job worker,' or toller for ODS." *IDM* at 4:

ODS explains that OISI issues a debit note to ODS for the cost of labor, electricity and consumables incurred by OISI in Oman; ODS reimburses OISI for these costs; and ODS owns the materials OISI consumes to produce the nails. ODS argues that OISI's financial statements do not show cost of materials consumed, which is the main element of cost in the profit and loss account, and there is no opening and closing stock because OISI does not own stock in any form, as ODS maintains ownership of all materials processed by OISI. ODS argues that, because the income and expenses in the financial statements of OISI relate to job work (*i.e.*, tolling), they should not be considered as being in the same general category with respect to subject merchandise, as they bear no similarity to ODS'[s] business operations, and using them to calculate CV would inflate the profit and selling expenses ratios in a manner that does not reflect home market sales of the subject merchandise. Moreover, citing to the Department's 2015 Antidumping Manual, Chapter 7 page at 31, ODS argues that the Department itself recognizes that a toller is not a manufacturer for antidumping purposes where the toller or subcontractor does not acquire ownership of the subject merchandise and does not control the relevant sale of the subject merchandise or foreign like product.

*Id*.

The foregoing is indeed consistent with toll processing, which is simply an arrangement whereby where one company will process raw materials or partly completed goods for another. *See*, *e.g.*, *Atar, S.r.L. v. United States*, 35 CIT ___, Slip Op. 11-87 at 2 (July 22, 2011) ("[i]n a tolling arrangement, a producer employs a subcontractor that provides processing services for, or material for incorporation into, the merchandise that is sold by the producer"), referencing

*United States v. Eurodif S.A.*, 129 S.Ct. 878, 885 (2009); *see also Mid Continent Steel & Wire, Inc.*

*v. United States*, 41 CIT ___, ___, 219 F. Supp. 3d 1326, 1349 (2017) ("transactions for low carbon

wire drawing and steel nail making services performed by Pro-Team's tollers" disregarded).  On the

other hand, the last of ODS's points above overstates the import of the reference relied upon,

wherein Commerce stated that the purpose of "not consider[ing] a toller or subcontractor to be a

manufacturer or producer [under certain conditions] . . . is to enable the Department to identify the

appropriate seller *of subject merchandise and foreign like product* for purposes of calculating export

price, constructed export price, and normal value."   Antidumping Manual, Ch. 7, p. 31 (italics

added).  It does not follow, from distinguishing production of subject merchandise, that a toller or

subcontractor can not be considered a "producer" of merchandise in its own right.

A "producer" is defined, tautologically, as "one who produces, brings forth, or

generates".  *Black's Law Dictionary* at 1209 (6th ed.).  In other words, all the material output of an

entity is "production."  But for purposes of the AD statute, it would appear that whether "tolling"

can be concluded as providing a mere "service" in the production of merchandise, subject or non-

subject, or can be regarded as "production" in its own right, is necessarily dependant upon the

circumstance of each case.  *See*, *e.g.*, *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United*

*States*, 442 CIT ___, ___, 287 F. Supp. 3d 1361, 1373 (2018) ("cooperating tollers provided over

80 percent of the product"); *Atar, S.r.l. v. United States*, 33 CIT 658, 665 (2009) (dispute over "date

on which Atar instructed its toll processor to produce pasta"); *Goldlink Indus. Co. v. United States*,

30 CIT 616, 637, 431 F. Supp. 2d 1323, 1341 (2006) (plaintiff "requests that Commerce recalculate

the cost of toll production by applying the financial ratios to the cost of materials, energy and labor

in the toll production process").  Regardless, however, tolling operations are necessarily part of "production," regardless of whether they may be interpreted as mere "service" thereto.

The foregoing leads to the more germane argument, over whether substantial evidence supports Commerce's interpretation of OISI's financials, which underpins Commerce's decision that OISI's toll manufacturing is a "service" and not "production" in its own right.

II

ODS's argument, above, that "using [OISI's financials] to calculate CV would inflate the profit and selling expenses ratios in a manner that does not reflect home market sales of the subject merchandise" appears to be a *non-sequitor* in view of the fact that ODS did not make home market sales of the subject merchandise in any event, which was the whole point of Commerce having to resort to option (iii) for ODS's profit and selling expenses.  As mentioned, Commerce rejected OISI's financial statements upon the following reasons:

> OISI's financial statements do not include any inventory accounts, and the cost of sales figure does not include any raw material costs. The absence of any inventory and material costs indicates that OISI's financial results and profit are more reflective of a company providing a service, not a good, and as such, are not a good surrogate for CV profit, when compared with ODS.

*IDM* at 8 (footnote omitted).

Mid Continent raises three points in this regard.  First, it draws attention to Commerce's acknowledgment that "the financial statements of OISI and [LSI] sufficiently identify income statement line items for direct selling expenses and indirect selling expenses, and non-selling related expenses necessary to calculate selling expense ratios", and it argues that inventory accounts have no bearing on profit and selling expenses.  Pl's 56.2 Br. at 10, quoting *IDM* at 10. Second, it

contends that if inventory accounts are relevant to profit and selling expenses, Commerce erred in

stating that OISI does not include inventory accounts because OISI's financial statements in fact

show "Opening stock" and "Closing stock", *see* ODS's SQR (Jan. 12, 2016) at Ex. S1-1(E), page

11 (Note 11), PDoc 49, which it claims are just different names for inventory accounts, and which

Mid Continent compares with LSI's financial statements as likewise not referring to "inventory

accounts" but instead referring to "Raw materials remained" and "Deduct remained raw materials."

*See* ODS's CV Profit Comments (Apr. 28, 2016) at Exhibit CV-2(c), page 7 (titled "Sale capital

details"), PDocs 87-89.   Third, Mid Continent contends Commerce failed to recognize that while

OISI's cost of sales figure does not specifically break out "raw materials", it does include a line item

for "production expenses", the largest single value included in cost of sales. PDoc 49 at Ex. S1-1(E),

page 11 (Note 11). It then compares this with LSI's cost of sales figure, called "Total expense of

sales" in LSI's financial statements, which similarly does not include any cost item labeled "raw

materials."[2]   *See* PDocs 87-89 at Ex. CV-2(c), page 8 (titled "Expenses details of sale and

administration").

On the correctness of Commerce's decision here, defendant argues that "because

record evidence indicated that OISI operates on a job work or toll basis on behalf of ODS,

[Commerce determined that] OISI lacks the requisite profit and selling experience in the production

---

[2] Pl's 56.2 Br. at 10-11.  Mid Continent also argues that Commerce is itself currently treating OISI as a producer, given that it is a mandatory respondent in the first annual administrative review in the *Certain Steel Nails from Oman* proceeding. *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014-2016*, 82 Fed. Reg. 36738 (Aug. 7, 2017).  Each segment of a proceeding is accorded *tabla rosa* treatment, however.  *See, e.g.*, *Pakfood Pub. Co. v. United States*, 34 CIT 1122, 1134, 724 F. Supp. 2d 1327, 1342 (2010), *aff'd* 453 Fed. Appx. 986 (2011).

of merchandise comparable to subject merchandise." Def's Resp. at 14. "Mid Continent does not

explicitly deny . . . that a company without inventory costs is more reflective of a company providing

a service than one producing a good, such as steel nails." *Id*. at 15.  The defendant also emphasizes

that although Note 11 to OISI's financial statements does include line items for "Opening stock" and

"Closing stock," they do not reflect any values.  *Id*.  "OISI's financial statements do not reflect any

cost of materials consumed, which would have been expected if OISI had produced steel nails during

the period of review."  *Id*.  And, on Mid Continent's argument that raw materials are jointly ordered

and commonly stored and that ODS's and OISI's financial records reflect "little more than an

accounting fiction", Pl's 56.2 Br. at 15, the defendant contends that because the cost of raw materials

are not reflected in OISI's financial statements, Commerce determined that OISI's records do not

reflect "amounts incurred and realized" by ODS in the production of subject merchandise, consistent

with alternative (iii) for CV profit and selling expenses.  *Id.* at 16.  "A calculation based on OISI's

profit and expense data would be tantamount to a removal of raw material purchases from the

financial statements of ODS, and would not be representative of the profit and selling expense

incurred by a producer of merchandise comparable to subject merchandise." *Id.*

      Mid Continent's reply argues that both ODS and OISI obviously produce nails and

that  ODS reported "all sales of the subject merchandise are made-to-order", *see* PDoc 25 at A-16,

and that the kind of modern-day made-to-order manufacturing in which OISI engages would

obviously incur no inventory costs because they would not maintain inventory.[3]  "It is thus no

---

[3] Along these lines, ODS specifically reported: "The sales process for nails produced by OISI for ODS is the same as nails produced by ODS, as explained on page A-15 of ODS' Section A response. The sales process begins with the negotiation of prices, quantity and other sales terms

(continued...)

surprise that the company would not report inventory costs." Pl's Reply at 3. From this, Mid

Continent notes that the defendant separately faults its observation that the line item in OISI's

financial statement for "production expenses" could include raw materials, *see* Def's Br. at 17, but

does not deny that the line item "production expenses" could include raw materials. "Defendant

simply speculates, with no support, that it does not", while also speculating that the category is

"consistent with OISI's role as a job worker or toller on behalf of ODS". *Id.* Mid Continent thus

argues that OISI's financial statements must include expenses incurred to produce those nails, *i.e.*,

"production expenses", because "[o]nly by relying on its . . . assertion that OISI does not produce

nails can Commerce claim that an account for "production expenses" does not include . . .

'production expenses.' " *Id.* at 4.

        The papers submitted, however, are insufficient from which to infer that ODS's

production did not involve any inventory costs or that OISI's "production expenses" correspondingly

included such costs, and the court cannot conclude those facets irrelevant. Mid Continent argues

OISI's "financial statement contains line items that would include raw materials", but the defendant

argues the relevant line items contained no values. Mid Continent's argument does not sufficiently

address either that or the defendant's further point, *supra*, that relying upon OISI's profit and

expense data would in effect remove the cost of raw material purchases from the ODS's financial

---

        [3] (...continued)

between ODS and its U.S. customers. Once prices and quantities are agreed upon, and before
issuance of the purchase order by the customer, management informs the customer the name of the
company (*i.e.*, ODS or OISI) that will produce and ship the nails, so that the customer can issue the
purchase order accordingly. Therefore, after the purchase order is received (for nails to be produced
by OISI), OISI starts producing nails and ships them directly to U.S customers from the Sohar Port
in Oman. Omani-produced nails are not shipped to ODS in Dubai prior to sale to the United States."
PDoc 49 at 7.

statements and would be unrepresentative of the profit and selling expense incurred by a producer of merchandise comparable to the subject merchandise.

The court has not been provided ODS's financial statements for examination, and thus it would be speculative for the court to opine on ODS's inventory costs.  Relying on the papers before it in rendering its decision, the court concludes that the arguments presented do not overcome the presumption of administrative regularity that attaches to the making of Commerce's decision, nor can the court conclude Commerce's interpretation of OISI's financial statements to have been clear error.  *See*, *e.g.*, *NEC Corp. v. U.S. Dep't of Commerce*, 21 CIT 933, 949, 978 F. Supp. 314, 330 (1997) (clear and convincing test is necessary to rebut presumption of administrative regularity), *aff'd sub nom*. *NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998).  Commerce concluded OISI a "mere" toll processor and not a producer of comparable merchandise, it eliminated OISI's financial statements from contention among those on the record for use as possible surrogates for ODS's profit and expense data, and it selected LSI's financials based on the quality of their data. Substantial evidence of record supports that determination.

However, Mid Continent also contends that the defendant's argument that the LSI financial statement is qualitatively superior when examined in the context of the factors developed in *Pure Magnesium from Israel* and *CTVs from Malaysia*[4] actually has the situation reversed, and

---

[4] Def. Br. at 11, citing *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg. 49349 (Sep. 27, 2001), accompanying I&D Memo cmt. 8 ("To determine the most appropriate profit rate under alternative (iii), the Department has weighed several factors. Among them are: (1) the similarity of the potential surrogate company's business operations and products to the respondent; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; (3) the contemporaneity of the surrogate data to the POI; and (4) the similarity of the customer base (i.e., retail versus OEM). The (continued...)

that those "factors unequivocally demonstrate that OISI, and not LSI, is the qualitatively superior

source and should be used alone." Pl's Reply at 4-5. It contends: that OISI and ODS have literally

identical production processes, business operations and products, use the same equipment and raw

materials to produce the same steel nails for the same customers, have the same owner, share sales

and marketing staff, have production decisions jointly made for them, and produce the exact same

nails; that the OISI financial statements are contemporaneous with the POR; and that the customer

bases of OISI and ODS "have to be *identical* given the way the companies are commonly managed."

*Id*. at 5 (italics in original).

   All of which may be true. Nonetheless, the argument is insufficient to demonstrate

error in Commere's choice of LSI's financial statements in light of those aspects of the

administrative record that the parties have filed with the court. *See*, *e.g.*, *FCC v. Fox Television

Stations, Inc*., 556 U.S. 502, 513-14 (2009) ("a court is not to substitute its judgment for that of the

agency" and should "uphold a decision of less than ideal clarity if the agency's path may reasonably

be discerned") (citations omitted).

---

  [4] (...continued)
greater the similarity in business operations, products, and customer base, the more likely that there
is a greater correlation in the profit experience of the two companies"), and *Notice of Final
Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers From
Malaysia*, 69 Fed. Reg. 20592 (Apr. 16, 2004), accompanying I&D Memo cmt. 26 (same).

*Conclusion*

Having considered that arguments presented, the court concludes Commerce's resort to reliance upon the profit and selling expense data from the financial statements of the Thai company L.S. Industry to be supported by substantial evidence and in accordance with law.  The plaintiff's motion for judgment must therefore be, and hereby is, denied.

**So ordered**.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated:  May 22, 2018
New York, New York